MICHIGAN STATE AFL-CIO v CIVIL SERVICE COMMISSION

Docket No. 102567. Argued April 8, 1997 (Calendar No. 5). Decided July 31, 1997.

Michigan State AFL-CIO and several other unions, serving employees in the state classified civil service, and others brought an action in the Wayne Circuit Court against the Civil Service Commission and others, seeking to enjoin enforcement of revised Civil Service Commission Rule 1-5.7, which prohibits the use of union leaves of absence for partisan political activity. The court, John H. Hausner, J., granted summary disposition for the plaintiffs, ruling that they had standing to bring the action and that the commission, in promulgating the rule, had exceeded its authority and violated the Michigan political freedom act, 1979 PA 169, MCL 15.401 *et seq.*; MSA 4.1702(1) *et seq.* The Court of Appeals, GRIFFIN, P.J., and REILLY and T. M. BURNS, JJ., affirmed the standing issue, but reversed with respect to the rule, and remanded the case for consideration of the plaintiffs' pending constitutional claims (Docket No. 113228). On remand, the court granted summary disposition for the commission, finding that the rule did not violate equal protection or due process, and further that there was no violation of free speech and association. After remand, the Court of Appeals, MICHAEL J. KELLY, P.J., and CORRIGAN and C. D. CORWIN, JJ., affirmed the dismissal of the constitutional claims, holding that the revised rule affects the Civil Service Commission's legitimate ban on partisan political activity during actual-duty hours and that nothing in the rule offends a recognized constitutional right of free speech or assembly (Docket No. 149885). The Supreme Court remanded the case to the Court of Appeals to address the plaintiffs' argument that Rule 1-5.7 unconstitutionally bans speech and association on the basis of the content of the speech. On remand, the Court of Appeals, MICHAEL J. KELLY, P.J., and CORRIGAN and BANDSTRA, JJ., unable to identify a content-based abrogation of speech or association rights, affirmed in an unpublished opinion per curiam (Docket No. 191523). The plaintiffs appeal.

In an opinion by Justice CAVANAGH, joined by Chief Justice MALLETT, and Justices BOYLE and KELLY, the Supreme Court *held*:

Revised Civil Service Rule 1-5.7, prohibiting the use of union leaves of absence for partisan political activity, violates the Michigan political freedom act.

1. The political freedom act extends to employees in state classified civil service the right to engage in partisan political activity while on mandatory leaves of absence. What a state classified civil service employee does during off-duty hours, including political activity, is not of proper concern to the Civil Service Commission unless it is shown to adversely affect job performance. Whether an activity is off duty or actual duty depends on its particular circumstances. The political freedom act allows a state employee to engage in partisan political activity except during those hours when the employee is being compensated for the performance of duties as a public employee.

2. Where the union reimburses the state not only for the wages of an employee, but also the fringe benefits, the state may not prohibit that employee from participating in partisan political activities pursuant to the political freedom act. Because union leave is often antagonistic to an employer's interest and because an employee on union leave is not doing the duty the employee was employed to perform, the state may not prohibit participation in partisan political activities while on union leave pursuant to the political freedom act unless the activities are shown to adversely affect job performance.

Reversed.

Justice BRICKLEY, joined by Justices RILEY and WEAVER, dissenting, stated that, correctly interpreted, the political freedom act does not allow a classified state employee to engage in political activity while being compensated for the performance of the duties of a public employee. The majority determines that these employees were not compensated by the employer because the state was reimbursed for the total costs of their wages and benefits, and, thus, their activity is protected under the act. The source of the compensation is irrelevant, however. The fact that they were compensated merely presents the question whether they were engaged in the performance of their duties as public employees.

Employees on union leave are performing their duties as public employees. Employees are assigned to these types of leave by the state. Further, legitimate union activities contribute to a productive relationship between the state and its employees; the state, as employer, derives a benefit from the activities. The majority's holding to the contrary violates both the political freedom act and the collective bargaining agreement. Therefore, the application of Rule 1-5.7 to these employees did not violate the act.

Rule 1-5.7 is neither a content-based restraint on the freedom of speech in violation of the First Amendment of the United States Constitution nor an impermissible regulation of the content of speech during union leave. States have the authority to regulate the speech of their employees under certain conditions. The First Amendment protects a public employee's speech when that speech involves a matter of public concern and is not outweighed by the interests of the state employer. Rule 1-5.7 is limited to specific conduct while an employee is performing the duties of a public employee. The state's interest in preventing political activity while on actual duty overrides the employee's interest in engaging in such activity. It is evenhanded in its application, uniformly prohibiting certain political activities by employees engaged in the performance of their actual duties, defined to include all times when the employee is performing the duties of a state employee. Likewise, it does not violate the protection provided by the Equal Protection Clause of the Michigan Constitution. While employees on occasion will be treated differently than other employees, especially in regard to benefits such as union leave to which they are entitled, the designation of union leave as actual duty does not violate equal protection.

Further, the rule is not overbroad. It does not substantially interfere with conduct that the state cannot prohibit. Rather, it addresses a specific political activity by state employees when they are performing their duties as state employees. Under the constitution and the political freedom act, the state can regulate this behavior. This prohibition is consistent with the recognized interest of the state in preventing politics from interfering with the performance of classified state employees. In addition, the rule is not vague. It gives fair notice of the conduct prohibited. It is clear that both partisan and nonpartisan political activity are barred from working hours.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Andrew Nickelhoff* and *Theodore Sachs*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Deborah Anne Devine,* Assistant Attorney General, for the defendants.

Amicus Curiae:

*Robert A. Sedler* and *Paul Denenfeld* for American Civil Liberties Union Fund of Michigan.

CAVANAGH, J. This is an appeal by the Michigan State AFL-CIO, challenging the validity of Civil Service Rule 1-5.7, modified effective July 14, 1988, prohibiting the use of union leaves of absence for partisan political activity. We hold that the revised rule violates the political freedom act[1] enacted by the Michigan Legislature.

I

This case presents a rather long, factual and procedural history. In December 1987, the United Auto Workers-Community Action Program (UAW-CAP) and the Michigan Democratic Party sponsored a training seminar on election campaign strategies. The Office of the State Employer was given notice of the three-day seminar; however, it was unaware that the seminar would involve partisan political issues.

Fifty-six state employees who were members of the UAW Local 6000 attended the seminar. Thirty-seven employees used the union sponsored administrative leave buy-back program, under which the union reimbursed the state the net salary of the employees for the period of absence. Seventeen employees invoked the union officer leave, pursuant to a collective bargain, under which the union reimbursed the state for the gross total cost of the employee's wages and the employer's share of insurance premiums and retirement. One employee invoked the administrative leave

---

[1] 1976 PA 169, § 4, MCL 15.401 *et seq.*; MSA 4.1702(1) *et seq.*

bank 1, under which the employee suffered no loss of pay or benefits and one employee used his own time, which was not provided for under any leave arrangement.

In response to a letter from two Republican legislators, State Representative Frank Fitzgerald and Senator William Sederburg, the Civil Service Commission investigated the December 1987 meeting. As a result of the investigation, the commission issued a strong statement that partisan political activities are not to be engaged in by employees who are on administrative leave or who have been released from work under conditions specified for "union business" in bargaining agreements. The Department of Civil Service stated, "An employee using his or her authorized annual leave is not restricted, but annual leave used for partisan political purposes may not be 'bought back' under union business provisions . . . ."

As a result of the controversy over the December 1987 meeting, the commission revised its rule relating to the activity prohibited during work hours. The old rule provided:

> 1-5.7 Prohibited During Work Hours.—Activities permitted under Sections 1-5.1 and 1-5.5 shall not be engaged in by a classified employee during the hours the employee is on actual duty.[2]

---

[2] The activities referred to in both the old and new rule 1-5.7 are described in sections 1-5.1 and 1-5.5 of the Commission Rules, as follows:

> 1-5.1 Candidates for Public Office.—An employee in the classified service may become a candidate for nomination and election to any local elective office, partisan or non-partisan, without first obtaining a leave of absence.
>
> 1-5.1a An employee in the classified service may become a candidate for nomination and election to state office but shall request

The new rule provides:

> 1-5.7 Prohibited During Work Hours.—Activities permitted under sections 1-5.1 and 1-5.5 shall not be engaged in by a classified employee during the hours the employee is on actual duty. Actual duty includes the employee's scheduled work hours and overtime. Off duty includes all time outside scheduled work hours and overtime, annual leave, unpaid leave of absence, lost time and leave granted to the employee to become a full time employee of an employee organization holding exclusive representation rights, pursuant to an approved collective bargaining agreement. For purposes of this rule, employees released from their regular state workplace for union activities, union business or any other employee organization purpose under any leave agreement, including "annual leave buy-back" provisions, shall be considered to be on actual duty, assigned by the employer to take part in union activities deemed to be in the best interests of the state and not including partisan political activity.

In response to the rule change, an objection was filed by every employee organization exclusively representing state classified employees, representing in the aggregate approximately seventy-two percent of

---

and shall receive a leave of absence without pay at the time of compliance with the candidacy filing requirements or sixty (60) days prior to the election in question, whichever date is closer to the election.

\*  \*  \*

1-5.5 Political Party Activities.—An employee in the classified service may:

1-5.5a Become a member or an officer of a political party committee formed or permitted under the election laws of Michigan or of the United States.

1-5.5b Be a delegate to any convention held by a political party.

1-5.5c Engage in political activities on behalf of a candidate or issue in connection with a partisan or non-partisan election.

the state classified work force, or roughly 44,600 individuals.

The employees' objections stemmed from the commission's exclusion of partisan political activities while on union leave, while allowing partisan political activities while on other types of leave. To fully understand the employees' objections, it is necessary to review the different types of leave of absences that are available to an employee:

> 1. *Leave for Union Business.* There are seven types of leave for union business. The employee is compensated by the state in whole or in part.[3]

---

[3] The seven types of union leave are as follows:

a. Incidental Paid Time Off—to handle grievances, meet with management during working hours. . . .

b. Paid Annual Leave—available to all employees for personal business including but not limited to union activity, up to an annual hourly limit. CBA art. 39, pp. 112-116. An Employee organization may "buy-back" annual leave credits exhausted by an employee absent for union business. . . . The union can only exercise this option for any employee once per calendar quarter. The union reimburses the employer for the employee's net salary . . . .

c. Administrative Leave Bank 1—a bank of paid leave established for employees attending authorized union functions. . . . The employee suffers no loss of pay or benefits. . . .

d. Administrative Leave Bank 2—a bank of paid leave restricted to nine designated union officials for attendance to union business. . . . The union reimburses the employer for all applicable insurance premiums during the period the employee's absence is covered by this administrative leave bank. . . .

e. Union Officer Leave—leave of absence, compensation fully reimbursed by the union, for union representatives devoting over 25% of work year to union business. . . . [T]he union reimburses the employer for the gross total cost of the employee's wages and the employer's share of the insurance premiums and retirement. . . .

f. General Unpaid Leave—available for purposes of secondary education, medical treatment, military service, union office, maternity/paternity. . . .

*2. Jury Duty Leave.* The employee is granted administrative leave for jury duty, with full pay.

*3. Time off for Court Appearances.* The employee is entitled to administrative leave with full pay. However, if an employee appears in court in any capacity other than as a witness for the People, he or she will not be considered as being on duty, nor will administrative leave be granted.

*4. Sick Leave.* The employee may use accrued sick time, annual leave, or lost time to cover periods of approved medical absence. All sick leave must be approved by the employer.

*5. Annual Leave.* Initial annual leave is available upon approval of the employer, for such purposes of voting, religious observances, and necessary personal business.

*6. Paid Leave.* The employee is authorized to use paid leave for education and systematic improvement of knowledge or skills required in the performance of their work.

The State Personnel Director reviewed the objections filed by the employees; however, it found no

---

g. Administrative Leave Buy Back—not part of [the collective bargaining agreement] based on bargaining and past practice. This is often used for large, one time meetings or trainings, for bargaining and other similar events. Under this arrangement, no leave time is deducted from an employee's annual leave balance . . . . The union designates those employees who will attend and the employer submits a bill to the union for the net salary for the period of absence.

basis for delaying the effective date of the enactment of the revised rule. Therefore, on July 14, 1988, the revised rule became effective.

The employee unions commenced the instant action in Wayne Circuit Court for a preliminary and permanent injunction restraining enforcement of revised Rule 1-5.7, and for declaratory relief. The parties filed cross-motions for summary disposition. On October 28, 1988, the circuit court granted summary disposition for plaintiffs. It ruled that the plaintiff employee organizations had standing to assert the claims and that the commission had exceeded its authority and violated the Michigan political freedom act. The trial court did not reach the constitutional issues raised in counts I and III of the complaint.

The commission appealed, and the Court of Appeals affirmed in part, reversed in part, and remanded the case for further proceedings. 191 Mich App 535; 478 NW2d 722 (1991) (hereinafter *AFL-CIO I*). The Court of Appeals affirmed the ruling that plaintiffs had standing to seek a declaratory judgment. *Id.* at 544-549. However, it reversed the ruling that the revised rule violated the political freedom act. Plaintiffs argued that union leave is "off-duty" time that is beyond the scope of regulation by the Civil Service Commission. However, the Court rejected plaintiffs' characterization of union leave as "off-duty" time because Rule 1-5.7 defines union leave time as "actual-duty." *AFL-CIO I* at 550-551. The Court stated that actual duty means on-the-job behavior related to job performance, including activities of classified employees during work hours for which they are being compensated.

The Court relied on *Council No 11, AFSCME v Civil Service Comm*, 408 Mich 385, 408; 292 NW2d 442 (1980), in which this Court stated that "the commission's 'sphere of authority' delimits its rule-making power and confines its jurisdiction over the political activity of classified personnel to on-the-job behavior related to job performance." The Court of Appeals held that a prohibition against political activity by classified employees is permissible under the political freedom act if three conditions are satisfied:

> (1) The classified employee receives some form of compensation for the time spent on leave,
>
> (2) The employee would be performing duties at the usual job site if the employee were not on leave, and
>
> (3) The employee is permitted to leave for a specific purpose approved by the employer. [*AFL-CIO I, supra* at 550.]

The Court concluded that the release of employees under union leave was part of the employees' duties for which they were compensated, therefore the union leave programs at issue did not implicate classified employees' off-duty activities. The Court remanded the case for consideration of plaintiffs' pending constitutional claims. *Id.* at 552.

The parties again filed cross-motions for summary disposition with respect to the constitutional claims. Judge Hausner granted summary disposition for the commission, finding that the rule did not violate equal protection or due process, and further that there was no violation of free speech and association.

After remand, plaintiffs appealed, and in a decision issued February 6, 1995, the Court of Appeals affirmed the dismissal of plaintiffs' constitutional claims. 208 Mich App 479; 528 NW2d 811 (1995)

(hereinafter *AFL-CIO II*). It held that the revised rule affects the Civil Service Commission's "legitimate ban on partisan political activity during actual-duty hours. Nothing in this rule offends a recognized Michigan or federal constitutional right to free speech or assembly. The state government, as an employer, most assuredly may restrict the partisan political activity of its employees while they are on duty." *Id.* at 491. The Court also disagreed with the plaintiffs that the revised rule is unconstitutionally vague and overbroad, and that it violates equal protection and due process. It affirmed the decision of the trial court on remand.

Plaintiffs filed a delayed application for leave to appeal to this Court. In an order dated December 19, 1995, this Court remanded to the Court of Appeals "to address plaintiffs' argument that Rule 1-5.7 unconstitutionally bans speech and association on the basis of the content of the speech."

The Court of Appeals issued a supplemental opinion on remand on March 8, 1996, unpublished opinion per curiam (Docket No. 191523), which stated in part, "[t]he rule arose out of a specific incident of partisan political activities while employees were on union leave and the Commission amended the rule to address that problem. Unless and until evidence is adduced that the Commission fails to prevent other partisan political activity that comes to its attention in a similar fashion, we cannot identify a content-based abrogation of speech or association rights, much less a violation of equal protection."

The plaintiffs again appealed to this Court, and this Court granted leave on May 22, 1996. 451 Mich 898.

II

Initially, defendant asserts that plaintiffs failed to appeal the decision of the Court of Appeals in *AFL-CIO I* to this Court pursuant to MCR 7.301(C)(3) and (4), and instead pursued remand. As a consequence, defendant asserts, this Court is divested of its jurisdiction to review the determinations made in *AFL-CIO I*, and those determinations are now the law of the case. We reject defendant's argument.

MCR 7.302(C)(4) provides:

> If the decision of the Court of Appeals remands the case to a lower court for further proceedings, an application for leave may be filed within 21 days after
>
> (a) the Court of Appeals decision ordering the remand, or
>
> (b) the Court of Appeals decision disposing of the case following the remand procedure, in which case an application may be made on all issues raised in the Court of Appeals, including those related to the remand question.

We agree with plaintiffs that MCR 7.302(C)(4) gives the parties the option, after a Court of Appeals judgment ordering remand, of seeking immediate appeal or of waiting until proceedings following remand are completed, before seeking plenary appeal. The commentary to the rule provides guidance:

> New MCR 7.302(C)(4)-(6) clarifies the parties' options when a decision of the Court of Appeals remands the case to the trial court for further proceedings. Basically, a party may immediately appeal to the Supreme Court or may await the conclusion of the proceedings in the trial court and in the Court of Appeals following the remand.

Therefore, we retain jurisdiction over both *AFL-CIO I* and *AFL-CIO II*.

## III

### THE POLITICAL FREEDOM ACT

The political freedom act[4] is an uncommon exercise of the Legislature's power to protect and insure the personal freedoms of all citizens, "including the rights of free speech and political association . . . ." *Council No 11, supra* at 394. As a unanimous Court stated, the act "undertakes to authorize and extend to a specific class of citizens—employees in the state classified civil service—the right to engage in partisan political activity . . . while on mandatory leave of absence." *Id.* at 395.

In *Council No 11*, this Court stated:

> We do not question the commission's authority to regulate employment-related activity involving internal matters such as job specifications, compensation, grievance procedures, discipline, collective bargaining and job performance, including the power to prohibit activity during working hours which is found to interfere with satisfactory job performance. . . . The Court has also recognized the commission's power to regulate and even prohibit off-duty activity which is found to interfere with job performance. . . .

---

[4] 1976 PA 169, MCL 15.401 *et seq.*; MSA 4.1702(1) *et seq.*, states in pertinent part:

Sec. 2. An employee of the state classified civil service may:

\*    \*    \*

(d) Engage in other political activities on behalf of a candidate or issue in connection with partisan or nonpartisan elections.

\*    \*    \*

Sec. 4. The activities permitted by sections 2 and 3 shall not be actively engaged in by a public employee during those hours when that person is being compensated for the performance of that person's duties as a public employee.

That power does not extend, however, to the blanket prohibition of off-duty activities, political or otherwise, as a
matter of policy simply because such activities may conceivably interfere with satisfactory job performance. What
an employee does during his off-duty hours is not of proper
concern to the Civil Service Commission unless and until it
is shown to adversely affect job performance. Even then
the commission's authority is not to curtail the off-hours
activity, it is to deal with the adequacy of job performance . . . on a case-by-case basis. [*Id.* at 406-407 (citations
omitted).]

Our decision in *Council No 11* held that the state
may not regulate the off-duty political activities of
state classified civil service employees, unless those
activities were found to interfere with job performance.[5] The parties in this case dispute whether union
leave is off-duty or actual-duty activity. If the activity
is actual duty, the commission has the power under
the Michigan Constitution to regulate it. If, however,
the activity is off-duty, the commission may only regulate it if it affects job performance. We hold that
union leave is not "actual-duty" merely because the
commission has so defined it. If that were the case,

---

[5] We note that in *Council No 11* the commission argued that the political freedom act was a violation of Const 1963, art 11, § 5, and specifically
the provision that declares that the Civil Service Commission shall "regulate all conditions of employment in the classified service." *Id.* at 397. We
held:

[T]here is no provision in our Constitution which plainly, or by
fair implication, empowers the Civil Service Commission to regulate the off-duty political activity of classified civil servants as
attempted by Rule 7, or in any manner preemptively conflicts with
the power of the Legislature to enact 1976 PA 169. The statute
does not conflict with the Civil Service Commission's authority to
regulate, indeed proscribe, on-duty political activity or deal with
unsatisfactory job performance attributable to off-duty political
activity or any other cause on a case-by-case basis. [*Id.* at 408-409.]

the commission could define evenings and weekends as "actual-duty," and thus impermissibly regulate what employees do on their own time. Instead, we think that whether an activity is off duty or actual duty depends on the particular circumstances of the activity in question. In order to determine the status of union leave, we must look to the applicable provision of the political freedom act, which gives guidance regarding whether an activity is "actual duty."

The political freedom act allows a state employee to engage in partisan political activity except "during those hours when that person is being *compensated for the performance of that person's duties as a public employee.*" 1976 PA 169, MCL 15.404; MSA 4.1702(4) (emphasis added). We hold that the language of the political freedom act is unambiguous. It prohibits partisan political activity during work hours when two conditions are met: (1) the employee is being compensated by the employer, and (2) such compensation is for the performance of the employee's duties as a public employee.

Whether the revised Rule 1-5.7 violates the political freedom act necessarily depends on whether the employee, when taking union leave to engage in partisan political activities, is compensated by the state for the performance of duties as a public employee. While the revised rule was enacted after the political meeting took place, the rule was created because of what the commission perceived to be a misuse of union leave. Therefore, by way of example only, we find it is illustrative to examine the particular facts relating to the employees who took union leave to participate in the seminar. As stated previously, there were fifty-six employees who took union leave to par-

ticipate in the three-day seminar. However, because not all union leaves of absence are paid for by the state, we must examine each type of union leave invoked.

### 1. UNION OFFICER LEAVE

Seventeen union members invoked their union officer leave to participate in the seminar. Union officer leave applies to union representatives who devote over twenty-five percent of work a year to union business. Because these union members are not "full time employee[s] of an employee organization holding exclusive representation rights" as required under the revised rule, they would be prohibited from engaging in partisan political activities while on leave. However, pursuant to article 7(D)(2) of the collective bargaining agreement, the union reimburses the employer for the gross total cost of the employee's wages *and* the employer's share of the insurance premiums and retirement. Therefore, the employer does not pay any compensation to these employees for the use of union officer leave. Because the revised rule is violative of the first prong of the test for the political freedom act, the rule is invalid as it applies to union officer leave.

### 2. ADMINISTRATIVE LEAVE BUY-BACK

Thirty-seven employees invoked their administrative leave buy-back in order to participate in the seminar. Under this type of leave arrangement, the union designates those employees who will attend, and the employer submits a bill to the union for the net salary for the period of absence. Under the first prong of the test, the employer is reimbursed only the net salary of the employee for the period of absence. However, the

insurance premiums and fringe benefits are paid by the employer. Because this partial payment constitutes compensation by the employer, the state may have a legitimate interest in regulating the conduct of its employees. Therefore, the first prong of the test is satisfied.

As to the second prong, the state must demonstrate that the compensation is for the "performance of [the employee's] duties as a public employee." The plaintiffs contend that the payment of fringe benefits is not compensation directly for the performance of duties. They cite federal cases that distinguish between "wages, i.e., sums paid to an employee specifically for the work he performs, and . . . compensation occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work." *BASF Wyandotte Corp v Local 227, Int'l Chemical Workers Union,* 791 F2d 1046, 1049 (CA 2, 1986). Plaintiffs contend that continuation of fringe benefits during an employee's union leave is not direct payment for services rendered, but rather an incident of the employer-employee relationship generally. We agree.

Whether an employee on union leave is compensated for the performance of the employee's duties as a public employee under the political freedom act is an issue of first impression. However, we have previously considered whether an employee's injury that occurred while the employee was conducting union business arose out of, and in the course of, his employment for purposes of worker's compensation. In *Tegels v Kaiser-Frazer Corp,* 329 Mich 84; 44 NW2d 880 (1950), we held that an employee is not considered to be in the employer's service when he is

engaged in union activity. Citing California precedent, we stated

> "[R]espondent [] was attending a union meeting from which her employer and his representatives were expressly excluded. At the time respondent [] was injured she was not acting for her employer nor engaged in his service. She was exercising a personal privilege for her own personal benefit in attending a meeting of an organization of which she was a member and the purposes of which were clearly for her own interests and not necessarily in any way for the benefit of her employer." [*Id.* at 88, quoting *Associated Oil Co v Industrial Accident Comm*, 191 Cal 557, 562; 217 P 744 (1923).]

We agree with *Associated Oil* that an employee is acting in the scope of employment when "the employee is doing the duty he is employed to perform . . . ." *Id.*

Similarly, in interpreting the Civil Service Reform Act,[6] the United States Supreme Court has held that there is a

> basic assumption underlying collective bargaining in both the public and the private sector that the parties "proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest." *NLRB v Ins Agents' Int'l*, 361 US 477; 80 S Ct 419; 4 L Ed 2d 454 (1960), quoted in *General Building Contractors Ass'n v Pennsylvania*, 458 US 375, 394; 102 S Ct 3141; 73 L Ed 2d 835 (1982). [*Bureau of Alcohol, Tobacco & Firearms v Federal Labor Relations Authority*, 464 US 89, 107-108; 104 S Ct 439; 78 L Ed 2d 195 (1983).][7]

---

[6] 5 USC 7131(a).

[7] Other federal courts, in interpreting the Taft-Hartley Act, 29 USC 186(a), have held that compensation to employees on leaves of absence for union business is not compensation for work performed for the employer. See *BASF Wyandotte Corp v Local 227, Int'l Chemical Workers*

Finally, the collective bargaining agreement with the union and the state clearly indicates that employees on union leave are conducting business for the union and not for the state. The agreement provides that union "representatives are to be considered as employees of the Union during the periods of absence covered by Administrative Leave from the bank."

These arguments, while not binding on the issue presented, are persuasive authority for our holding today. We hold that under the political freedom act, an employee who receives fringe benefits for attending a union meeting is not being compensated by the employer for the "performance of [the employee's] duties as a public employee." While attending a union meeting, the employee is not doing the duty he was employed to perform. Furthermore, the interests of the union and the employer are often "antagonistic." It would be paralogistic to hold that an employee who receives compensation from the employer to engage in activity that is antagonistic to the employer's interest is somehow receiving compensation for the performance of the employee's duties as a public servant.

Therefore, because the compensation is not for the performance of the employee's duties as a public employee, the prohibition is invalid under the political freedom act as it applies to administrative leave buy-back.

### 3. ADMINISTRATIVE LEAVE BANK 1

One employee invoked administrative leave bank 1 in order to participate in the seminar. With this type

---

*Union, supra* at 1048-1049; *NLRB v BASF Wyandotte Corp*, 798 F2d 849 (CA 5, 1986); *Communications Workers of America v Bell Atlantic Network Services, Inc*, 670 F Supp 416; 126 LRRM 3015 (D DC, 1987).

of leave, the employee suffers no loss of pay or benefits. Therefore, the first prong of the test is satisfied because the employee receives compensation and fringe benefits from the employer. However, like administrative leave buy-back, the second prong is not satisfied because the employee is not being compensated for the performance of his duties as a public employee.

#### 4. OWN TIME (NOT UNDER ANY LEAVE ARRANGEMENT)

Because the parties have not submitted any documentation regarding whether the employee using his own time was being paid by either the union or the employer, we cannot make a determination that prohibiting him from engaging in political activities was violative of the political freedom act.

Therefore, we hold that where the union reimburses the state not only for the wages of the employee, but also the fringe benefits, the state may not prohibit those employees from participating in partisan political activities pursuant to the political freedom act. Furthermore, because union leave is antagonistic to an employer's interest and because an employee on union leave is not doing the duty he was employed to perform, the state may not prohibit employees from participating in partisan political activities while on union leave pursuant to the political freedom act unless such activities are shown to adversely affect job performance.[8] We caution that our holding today is limited to the application of the political freedom act to union leave. We do not

---

[8] We note that the defendant has made no showing that union leave adversely affected the employees' job performance.

express an opinion with regard to any other leave arrangement that is regulated by the state.

In view of the invalidity of Rule 1-5.7 under the political freedom act, we decline to reach the constitutional issues framed by the plaintiffs-appellants. As we have repeatedly stated, "there exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case." *Booth Newspapers, Inc v Univ of Michigan Bd of Regents,* 444 Mich 211, 234; 507 NW2d 422 (1993); *Taylor v Auditor General,* 360 Mich 146, 154; 103 NW2d 769 (1960). Therefore, we reverse the decision of the Court of Appeals.

MALLETT, C.J., and BOYLE and KELLY, JJ., concurred with CAVANAGH, J.

BRICKLEY, J. The majority allows classified state employees to engage in partisan political activities during the performance of their official duties as public employees. I cannot agree with this holding and respectfully dissent.

### I. THE MICHIGAN POLITICAL FREEDOM ACT

#### A. THE RELEVANT STATUTORY LANGUAGE

The majority finds that Rule 1-5.7 of the Michigan Civil Service Commission violates Const 1963, art 11, § 5 and the political freedom act, MCL 15.401 *et seq*; MSA 4.1702(1) *et seq.,* because the rule applies to employees' activities outside the commission's regulatory power. *Ante* at 735-740. I cannot agree.

The constitution gives the commission authority over classified state employees. Const 1963, art 11, § 5. However, the scope of this authority is also defined by the political freedom act. MCL 15.401 *et*

*seq.*;  MSA 4.1702(1) *et seq.  Council No 11, AFSCME
v Civil Service Comm,* 408 Mich 385;  292 NW2d 442
(1980). Under the act, the commission may prohibit
political activity by a state employee "during those
hours when that person is being compensated for the
performance of that person's duties as a public
employee." MCL 15.404;  MSA 4.1702(4).  The majority
reads this to allow the commission to regulate such
activity "when two conditions are met: (1) the
employee is being compensated by the employer, and
(2) such compensation is for the performance of the
employee's duties as a public employee." *Ante* at 734.

However, I disagree with the first prong of the
majority's test. In this prong, the majority adds the
words "by the employer" to the statutory language.
However, the act does not identify the source of the
compensation. Thus, when correctly interpreted, the
statute does not allow a classified employee to
engage in political activity whenever he is being com-
pensated for the performance of the duties of a public
employee. The source of the compensation is irrele-
vant. This Court should not be so quick to read addi-
tional language into a clear statute.

Nor is this a distinction without a difference. The
majority uses this first prong to find that the commis-
sion exceeded its authority in terms of the seventeen
employees who invoked the union officer leave provi-
sion of the collective bargaining agreement. *Id.* at
735. The majority determines that these employees
were not compensated by the employer because the
state was reimbursed for the total costs of these
employees' wages and benefits. *Id.* Thus, according to
the majority, their activity is protected by the political
freedom act. However, under the correct reading of

the statute, the source of the compensation is irrelevant. Rather, the fact that these employees were compensated merely presents the question whether they were engaged in the performance of their duties as public employees.[1]

### B. THE PERFORMANCE OF DUTIES AS PUBLIC EMPLOYEES

The majority also concludes that activities done while on union leave are not part of the duties of public employees. I disagree with this conclusion. First, the state, as employer, controls the duties of its employees. This Court has recognized that the commission has "plenary and absolute powers in its field," and its actions are subject to limited judicial review. *Viculin v Dep't of Civil Service*, 386 Mich 375, 398; 192 NW2d 449 (1971). The commission has the authority to regulate job specifications, discipline, and job performance. *Council No 11, supra* at 406-407. Consistent with this authority, it is clear that the union could not remove these employees from their normal duties without the consent of the commission. Rather, the union must request the release of represented employees for union leave, and the commission has the ability to refuse this request. Also, these employees were presumably subject to discipline by the state had they failed to attend the assigned union function. Thus, it is clear that the commission assigned these employees to work as "employees of the Union."

Second, the majority assumes that union activities are always contrary to the employer's interests. *Ante* at 738. This leads the majority to conclude that

---

[1] However, I do agree that no determination can be reached concerning the one employee who used his own time. *Id.* at 739-740.

employees on union leave must not be performing their duties as public employees while on union leave. *Id.* I cannot agree with this analysis. While parties may enter the collective bargaining process with interests that are "to an extent antagonistic," *NLRB v Ins Agents' Int'l Union,* 361 US 477, 488; 80 S Ct 419; 4 L Ed 2d 454 (1960), that does not necessarily mean that labor unions and management always have diametrically opposed interests. Union activities often provide mutual benefit to both the union and the employer.[2] When properly used, union leave contributes to a peaceful and productive relationship between the state and its employees. This, in turn, provides a benefit to the state by improving state services. Thus, the state does reap a benefit from union leave. This is consistent with the state's willingness to assign its employees to union leave, and leads to the conclusion that union leave is very much a part of employees' duties as public employees.

The majority relies on *Tegels v Kaiser-Frazer Corp,* 329 Mich 84; 44 NW2d 880 (1950), to support the proposition that an employee on union leave is not performing the duties of a public employee. However, this reliance is misplaced. *Tegels* addressed the question whether the employee's injury was sustained in the course of employment under the Worker's Disability Compensation Act. *Tegels* was limited to its facts, and expressly stated that such cases are to be determined on their facts. *Id.* at 86-87. Moreover, the facts

---

[2] See *Herndon v UAW Local No 3,* 56 Mich App 435; 224 NW2d 334 (1974) (finding that union activities provide a benefit to the employer so that a union steward processing grievances who assaulted a coemployee was in the same employment as the coemployee under subsection 827[1] of the Worker's Disability Compensation Act. MCL 418.827[1];    MSA 17.237[827][1]).

of *Tegels* are distinguishable from this case. In *Tegels*, the employee was injured on an unpaid lunch hour, during which he was "free to come and go as [he] pleased." *Id.* at 85. In this case, all but one of the employees were compensated for their time. Further, they had been assigned to union leave by their employer and were not free to use the time as they pleased. Thus, I do not believe that *Tegels* is persuasive in this case.[3]

Similarly, the majority's resort to private sector federal labor law is also unavailing. The majority cites three cases, *BASF Wyandotte Corp v Local 227, Int'l Chemical Workers Union*, 791 F2d 1046 (CA 2, 1986), *NLRB v BASF Wyandotte Corp*, 798 F2d 849 (CA 5, 1986), and *Communications Workers of America v Bell Atlantic Network Services, Inc*, 670 F Supp 416 (D DC, 1987), for the proposition that "compensation to employees on leaves of absence for union business is not compensation for work performed for the employer." *Ante* at 737, n 7. I am not persuaded.

These cases all deal with the application of § 302 of the Labor Management Relations Act. 29 USC 186(a). That statute prohibits payments by an employer to unions or their representatives. *Id.* The act is aimed at the prevention of bribery of union officials. *NLRB, supra* at 855. However, there are several exceptions to the act's prohibition. 29 USC 186(c). The first authorizes payments to a union representative if that individual's "established duties" include labor rela-

---

[3] Further, the modern trend in worker's compensation law is to view union activities as being within the scope of employment because of the mutual benefit received by the union and the employer. See 2 Larson, Workers' Compensation, § 27.33(c), pp 5-414 through 5-417.

tions. 29 USC 186(c)(1). It is this exception that concerned each of the three cases cited by the majority.

These opinions were clear that they were not examining whether the employees' activities were for the employer, but only whether the employee was a bona fide employee of the employer. *Id.*; *Local 227, supra* at 1049; *NLRB, supra* at 855-856. Each opinion found that employees on union leave were employees of the employer, so that compensation for time spent on union leave was proper under § 302. *Local 227, supra* at 1049-1050; *NLRB, supra* at 855-856; *Communications Workers, supra* at 423-424. This finding was reached despite the fact that the employees' union activities were not for "direct services to the employer." *Local 227, supra* at 1049.

The majority apparently seeks to twist the "direct services" comment in *Local 227* to mean that these employees were found not to be working for their employers in any form while on union leave. However, the actual holdings of these cases belie this result. The fact that compensation for these employees was found to be proper under the Labor Management Relations Act required a finding that the employees were still "bona fide" employees of their employers while performing union activities while on union leave. Indeed, union leave was found to offer an indirect benefit to the employer. *Communications Workers, supra* at 422. Thus, these opinions actually stand for the proposition that, though union activities may not be "direct services" to the employer, such activities are still part of the employment duties of union members. If these federal private sector cases have any relevance in this case, they support the proposition that the activities of state employees

while on union leave are part of their duties as public employees and within the authority of the commission.

Third, the majority's inclusion of political activity in the phrase "union activities" violates the collective bargaining agreement and the political freedom act. Political activity is a prohibited subject of bargaining under the commission rules that authorize collective bargaining. Civil Service Rule 6-2.1(I)(3). Thus, there is no authority in the contract for the assignment of an employee to political activity. This prohibition is also found in § 5 of the political freedom act:

> A public employer, public employee or an elected or appointed official may not personally, or through an agent, coerce, attempt to coerce, or command another public employee to pay, lend, or contribute anything of value to a party, committee, organization, agency, or person for the benefit of a person seeking or holding elected office, or for the purpose of furthering or defeating a proposed law, ballot question, or other measure that may be submitted to a vote of the electors. [MCL 15.405; MSA 4.1702(5).]

I cannot understand how the assignment of a state employee to work on a political campaign is consistent with this provision. Rather, the majority's holding forces the commission to violate both the collective bargaining agreement and the political freedom act. Thus, I must conclude the majority's conclusion is flawed.

Employees on union leave are performing their duties as public employees. Employees are assigned to these types of leave by the state. Further, legitimate union activities contribute to a productive relationship between the state and its employees. Thus, the state, as employer, derives a benefit from those

activities. The majority's holding to the contrary violates both the political freedom act and the collective bargaining agreement. Therefore, excluding the one employee who may not have been compensated, I would find that the application of Rule 1-5.7 to these employees did not violate the act.

## II. FREEDOM OF SPEECH

The plaintiffs contend that Rule 1-5.7 is a content-based restraint on the freedom of speech in violation of the First Amendment of the United States Constitution. The majority does not reach this issue because of its finding that the rule violates the political freedom act. However, I would hold that the rule violates neither the act, nor the First Amendment.

States have the authority to regulate the speech of their employees under certain conditions. The First Amendment protects a public employee's speech when that speech is on a matter of public concern and is not outweighed by the interests of the state employer. *Waters v Churchill*, 511 US 661, 668; 114 S Ct 1878; 128 L Ed 2d 686 (1994) (plurality opinion); *Connick v Myers*, 461 US 138, 142; 103 S Ct 1684; 74 L Ed 2d 708 (1983); *Pickering v Bd of Ed of Township High School Dist 205, Will Co, Illinois*, 391 US 563, 568; 88 S Ct 1731; 20 L Ed 2d 811 (1968).

Political activity is clearly a matter of public concern. However, there is no dispute in this case that, given the history of the civil service in Michigan, the state has a highly significant, compelling interest in the elimination of political activity in the ranks of the classified civil service during time spent in the performance of official duties. *Council No 11, supra* at 397-407, see also *Wachsman v City of Dallas*, 704 F2d

160, 166-167, 172 (CA 5, 1983), cert den 464 US 1012 (1983). Further, as discussed above, the rule is limited to specific conduct while an employee is performing the duties of a public employee. I would find that the state's interest in preventing political activity while on actual duty overrides the employee's interest in engaging in such activity.

However, the state may not target speech because of its content. The United States Supreme Court has clearly set forth the law in this area. The Court has stated that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v Rector & Visitors of Univ of Virginia*, 515 US 819, 828; 115 S Ct 2510; 132 L Ed 2d 700 (1995). The government may not permit the use of a forum to people whose views it finds acceptable, but deny the use to those wishing to express a more controversial, less-favored view. However, I disagree that Rule 1-5.7 discriminates in this manner.

The rule is evenhanded in its application. It uniformly prohibits certain political activities by employees engaged in the performance of their actual duties. The rule then defines "actual duty" to include all times when the employee is performing the duties of a state employee: scheduled work hours, overtime, and union leave. No employees on actual duty are allowed to engage in the political activities listed in Rules 1-5.1 and 1-5.5. Therefore, the state has uniformly denied the use of actual duty time as a forum for political speech. Thus, I would find that Rule 1-5.7 does not violate the First Amendment of the United States Constitution.

### III. EQUAL PROTECTION

The employees and their union contend that Rule 1-5.7 violates the protection provided by the Equal Protection Clause of the Michigan Constitution.[4]

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation. [Const 1963, art 1, § 2.]

The plaintiffs contend that the application of Rule 1-5.7 violates this provision by restricting their off-duty political activity in a way that does not apply to nonunion members. I disagree.

The Equal Protection Clause requires the state to treat people in similar circumstances in a similar fashion. *Vacco v Quill*, 521 US ___, ___; 117 S Ct 2293, 2297; 138 L Ed 2d 834 (1997); *Moore v Spangler*, 401 Mich 360, 370; 258 NW2d 34 (1977). The Michigan Equal Protection Clause is to be interpreted as extending the same projections as those afforded by the federal constitution. *Armco Steel Corp v Dep't of Treasury*, 419 Mich 582, 591; 358 NW2d 839 (1984); *Fox v Employment Security Comm*, 379 Mich 579, 588; 153 NW2d 644 (1967); *Harville v State Plumbing & Heating, Inc*, 218 Mich App 302, 305-306; 553 NW2d 377 (1996).

As detailed above, I feel that union leave is time spent in the performance of the duties of a public

---

[4] The plaintiffs also claim that the rule violates the Due Process Clause. Const 1963, art 1, § 17. However, they couch their argument in terms of the Equal Protection Clause. Thus, I will not treat their due process argument separately.

employee. Thus, the rule uniformly applies to all employees while performing such duties. The union's argument to the contrary is belied by the fact that union members are the only state employees entitled to union leave. I would affirm the decision of the Court of Appeals that "the adoption of plaintiffs' views would lead to disparate treatment, because then only union employees could engage in partisan political activity while they are on duty." 208 Mich App 479, 494; 528 NW2d 811 (1995).

To any extent that the rule does treat union members differently, there is no violation of equal protection. The United States Supreme Court has approved of regulations on the political activity of members of a state's classified civil service that did not apply to other state employees. *Broadrick v Oklahoma*, 413 US 601, 607, n 5; 93 S Ct 2908; 37 L Ed 2d 830 (1973). This case is similar to *Broadrick* in that, just as classified employees are unique compared to other state employees, union members are different from nonrepresented employees. Thus, they will, on occasion, be treated differently than other employees, especially in regard to benefits to which only they are entitled, such as union leave. In short, the designation of union leave as "actual duty" time does not violate equal protection.

## IV. VAGUENESS AND OVERBREADTH

The plaintiffs also allege that the rule is vague and overbroad. The plaintiffs contend that the rule is vague because it states that union leave is for "union activities deemed to be in the best interests of the state and not including partisan political activity" without explicitly defining "partisan." Further, they

claim that the rule is overbroad because it may apply to both partisan and nonpartisan activities. However, both these arguments are flawed.

A statute or rule is impermissibly vague if it is 1) overbroad in its restriction of First Amendment freedoms, 2) does not give fair notice of the prohibited conduct, and 3) is so indefinite as to confer "unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed." *Woll v Attorney General*, 409 Mich 500, 533; 297 NW2d 578 (1980),  citing *Grayned v City of Rockford*, 408 US 104, 108-109; 92 S Ct 2294; 33 L Ed 2d 222 (1972).

First, the rule is not overbroad. A statute is overbroad if it applies to conduct that the state may not constitutionally control, as well as to activity that it may legitimately regulate. *Grayned, supra* at 114-115, see also *People v McCumby*, 130 Mich App 710, 714; 344 NW2d 338 (1983).  This interference with speech must not only be " 'real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' " *Osborne v Ohio*, 495 US 103, 112; 110 S Ct 1691; 109 L Ed 2d 98 (1990),  reh den 496 US 913 (1990),  quoting *Broadrick, supra* at 615.

This rule does not substantially interfere with conduct that the state cannot prohibit. Rather, it addresses a specific list of political activity by state employees when they are performing their duties as state employees. Under the constitution and the political freedom act, the state can regulate this behavior. This prohibition is consistent with the recognized interest of the state in preventing politics from interfering with the performance of classified state

employees. *Council No 11, supra* at 397-405. Thus, I would find that this statute is not overbroad.

Second, the rule gives fair notice of the conduct prohibited. The rule specifically identifies that the political activities enumerated in Rules 1-5.1 and 1-5.5 are forbidden during actual duty time. There is no contention that this list is vague in itself. Indeed, the list is similar in specificity to that which was found not to be vague in *Broadrick*.[5] Rather, the plaintiffs seek to read the rule as if the mention of partisan political activity were exclusive, meaning that only partisan political activity is forbidden on union leave. However this is not the case. Rather, the rule clearly states that all activities listed in Rules 1-5.1 and 1-5.5 are forbidden. The fact that both partisan and nonpartisan political activity are barred from working hours is clear upon a reading of Rules 1-5.1, 1-5.5, and 1-5.7.[6]

Finally, Rule 1-5.7 does not give unlimited discretion to any potential trier of fact. Rather, it specifically identifies and defines the prohibited activities. Thus, I would find that the rule is not constitutionally defective for vagueness or overbreadth.

### V. CONCLUSION

This is a significant and sensitive case. The issues presented go to the heart of the state's provision of services to the taxpayers. The civil service in this state has a "tortured" history as a result of the intrusion of political activity into the duties of its employees. *Council No 11, supra* at 400, n 13. The people of this state have clearly expressed a desire to remove

---

[5] *Id.* at 607-608.

[6] The same state interests that justify the limitation of partisan political activity also apply to nonpartisan activity. *Wachsman, supra* at 165-170.

politics from the civil service. However, through the political freedom act, they have also made it clear that the free speech rights of state employees are to be protected. However, I feel that the majority incorrectly defines union leave, finding that it is not time spent in the performance of the duties of a state employee. In so doing, it upsets the balance the citizens of this state have so carefully established. Therefore, I must respectfully dissent.

RILEY and WEAVER, JJ., concurred with BRICKLEY, J.